| | | |
|---|---|---|
| **CLEVELAND WASHINGTON,** | ) | |
| | ) | |
| Plaintiff**,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:24-CV-01213-NCC** |
| | ) | |
| **ABDULLAH, et al.,** | ) | |
| | ) | |
| Defendants**.** | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants Jennifer Clemons-Abdullah (Clemons-Abdullah) and Willie Jordan (Jordan) (collectively "Defendants"), by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submit this memorandum of law in support of their motion for summary judgment. In support, Defendants state:

## INTRODUCTION

On August 22, 2023, Officer Jordan was delivering breakfast trays to detainees' cells with the assistance of detainees Eric Williams (Williams) and Anthony Newberry (Newberry). At all times herein, Officer Jordan was 73-years old. During his morning detail, Williams and Newberry violently assaulted Officer Jordan: they hit Jordan in the head with one of the trays, threw him to the ground, locked him in a cell, stole his keys, handcuffed him, and sprayed him with mass amounts of pepper spray. Newberry then used Jordan's keys to unlock detainees' cells, including Plaintiff's. After Plaintiff's cell was unlocked, detainees entered the cell and attacked Plaintiff, causing various injuries. A violent riot ensued, wherein detainees in 4B held Jordan hostage, threatened his life, and caused immense property damage. Following the riot, detainees from the 4B wing of the CJC were temporarily housed in various cells while the 4B wing was cleaned and

1

reset from the massive amounts of property damage caused by the detainees. During this temporary housing of all 4B detainees, detainees received sack meals.

Plaintiff brings two claims under 42 U.S.C. § 1983: a Failure to Protect claim against Officer Jordan in his individual capacity and a Conditions of Confinement claim against Clemons-Abdullah in her individual capacity. (*See* Docs. 1 & 6).[1]

Judgment should be entered for Defendants, and against Plaintiff, for reasons outlined below.

**<u>FACTS</u>**

Defendants incorporate by reference their Statement of Uncontroverted Material Facts ("SUMF"), which is filed separately herewith. The material, operative facts, are as follows:

On the morning of August 22, 2023, Officer Willie Jordan was delivering breakfast trays to detainees in the 4B wing of the CJC. (UMF #3). This wing was known as the "hole," and housed detainees that had disciplinary violations. (UMF #4). Detainees Eric Williams and Anthony Newberry were assigned to assist Jordan. (UMF #5). Jordan did not personally select Williams and Newberry to assist him. (UMF #6). Jordan had no knowledge that Williams and Newberry were planning on initiating a riot that morning. (UMF #12). While delivering the breakfast trays, Williams hit Jordan in the head with one of the trays and threw Jordan to the ground. (UMF #8 & 9). Following this attack, Jordan was briefly unconscious. (UMF #10).

While regaining consciousness, Jordan was dragged into a shower cell. (UMF #14). In the shower cell, Williams forcefully took Jordan's mace, handcuffs, and radio off of his belt. (UMF #15). Williams then handcuffed Jordan's hands behind his back. (UMF #16). Newberry forcefully took Jordan's keys off of his belt. (UMF #17). Williams and Newberry then locked Jordan in the

---

[1] Plaintiff initially brought several more claims against several more defendants; however, after this Court's 28 U.S.C. § 1915 review of Plaintiff's Complaint, many of these claims were dismissed. (*See* Doc. 6).

shower cell. (UMF #18). Jordan began yelling in an attempt to gain the attention of other corrections officers but was unsuccessful. (UMF #19). Williams then administered the entire can of mace in Jordan's eyes. (UMF #20). Jordan remained locked in the shower cell and was unable to pursue or stop Williams and Newberry. (UMF #21). Without his radio, Jordan was unable to call for assistance. (UMF #38).

Newberry used Jordan's keys to unlock several detainees' cells as well as the doors separating wings 4B and 4A. (UMF #22). Newberry then gave his keys to another detainee who unlocked Plaintiff's cell. (UMF #23). Out of the view of Jordan, detainees entered Plaintiff's cell and attacked Plaintiff, causing him various injuries. (UMF #24 & 25). Jordan never knew or learned that Plaintiff was attacked until Plaintiff filed this lawsuit. (UMF #26). Prior to this attack, Plaintiff had never reported to Jordan, or any staff member at the CJC, that any of his attackers had made threatening comments towards Plaintiff. (UMF #27).

Sometime later, Williams dragged Jordan out of the shower cell. (UMF #32). Williams then unlocked one side of Jordan's handcuffs and instructed another detainee to lock that side of the handcuffs to one of the tables. (UMF #33). Jordan was then handcuffed to the table. (UMF #34). While Jordan was handcuffed to the table, one detainee threatened to cut Jordan's throat. (UMF #35).

Various detainees started causing massive amounts of property damage. (UMF #36). One detainee connected a detached shower drain to a piece of string and by swinging the shower drain, broke several sprinkler heads and the visitor booth windows. (UMF #37). Other detainees pulled down several hanging televisions, destroying them. (UMF #36). Williams made repeated threats using Jordan's radio, such as demanding pizza and chicken wings or else they would kill Jordan. (UMF #39 & 40).

Ultimately, members of the Saint Louis Metropolitan Police Department's Special Weapons and Tactics Team (SWAT) entered the 4B wing. (UMF #41 & 42). Upon entry, SWAT deployed tear gas and fired bean bag rounds. (UMF #42). SWAT was then able to restrain all detainees and free Jordan. (UMF #43). Jordan was taken via ambulance to the hospital where he was diagnosed with a concussion, thigh contusion, and a sprained ankle. (UMF #44 & 45). Following the event, Jordan had to go to rehab and physical therapy several times to treat his injuries. (UMF #46). Jordan also had to see a psychologist and a psychiatrist due to the events of the riot. (UMF #47).

Due to the massive amounts of property damage in the 4B wing, the detainees in 4B were temporarily housed in various cells throughout the CJC so that the 4B wing could be cleaned and repaired. (UMF #48). During that time, Plaintiff was housed in a cell which was typically used as a holding cell for detainees going to the courthouse and coming back from the courthouse. (UMF #49). Because regular meals served on trays could not be delivered due to the temporary housing accommodations, detainees received sack lunches. (UMF #50). These sack lunches consisted of a sandwich, chips, and a piece of cake. (UMF #50). The day after the riot, Plaintiff personally received two sack lunches. (UMF #52). Plaintiff returned to his cell in 4B one or two days after the riot. (UMF #51). Upon returning to their cells in 4B, detainees received their usual three meals a day, delivered to their cells on trays. (UMF #53 & 54). Plaintiff failed to utilize the grievance procedure available to him at the CJC regarding his injuries from the attack or his alleged lack of food during this time. (UMF #58). Despite his failure to file a grievance, Plaintiff filed this lawsuit on September 5, 2024. (UMF #58).

### STANDARD OF REVIEW ON SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if

4

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of his motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which he believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323.

After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to withstand the motion for summary judgment, the nonmoving party must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992) (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985)). If the evidence is not significantly probative, the state officials are entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248- 52 (1986). Because the burden is on the plaintiff to overcome a defense of qualified immunity, the plaintiff opposing summary judgment must demonstrate the existence of triable issues of fact precluding summary judgment. *Conrod v. Davis*, 120 F.3d 92, 95 (8th Cir. 1997) (citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)).

<u>**ARGUMENT**</u>

**I.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

The doctrine of qualified immunity shields government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). A government official is entitled to qualified immunity unless (1) he violated a plaintiff's constitutional right and (2) that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Once a defense of qualified immunity is raised, a plaintiff must offer 'particularized' allegations of unconstitutional or illegal conduct." *Conrod*, 120 F.3d at 95 (citing *Anderson*, 483 U.S. at 639–40). Qualified immunity is both a defense to liability and a limited "entitlement not to stand trial or face the other burdens of litigation." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Context is critical in determining qualified immunity. *See Estate of Walker v. Wallace*, 881 F.3d 1056, 1061 (8th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (internal quotations omitted).

In order for a right to be clearly established "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "In other words, the right violated must have been established 'beyond debate.'" *Mendoza v. U.S. Immigration and Customs Enforcement*, 849 F.3d 408, 417 (8th Cir. 2017) (quoting *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015) (quoting *City & County of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015))).

Further, it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "The clearly established law must be 'particularized' to the facts of the case." *White*, 580 U.S. at 79 (citing *Anderson*, 483 U. S. at 640). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 580 U.S. at 79 (quoting *Anderson*, 483 U. S. at 639). Qualified immunity gives "government officials breathing room to make reasonable but mistaken judgments." *Mendoza*, 849 F.3d at 416 (quoting *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014)) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)).

A. <u>Officer Jordan is entitled to qualified immunity from Plaintiff's Failure to Protect claim because Officer Jordan did not violate a clearly established right.</u>

"The Eighth Amendment requires officials to 'provide humane conditions of confinement' by taking reasonable steps to protect inmates convicted of crimes from assault by other inmates." *Hodges v. Department of Corrections*, 61 F.4th 588, 591 (8th Cir. 2023) (quoting *Farmer v. Brennan* 511 U.S. 825, 837 (1994)). However, a "constitutional claim does not lie every time one inmate attacks another." *Patterson v. Kelley*, 902 F.3d 845, 851 (8th Cir. 2018). "Pretrial detainee § 1983 claims are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment prohibition of cruel and unusual punishment." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011). "This makes little difference as a practical matter though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). "To prove an unconstitutional failure to protect from harm, [Plaintiff] must show (1) that he was incarcerated under conditions posing a substantial risk of serious harm, and (2) a defendant was deliberately indifferent to the substantial risk of serious harm." *Hodges*, 61 F.4th at 592.

       *i.*        *Officer Jordan is entitled to qualified immunity from Plaintiff's Failure to Protect claim where Jordan did not, and could not have known, that Plaintiff was in a substantial risk of serious harm when the attack on Plaintiff was a surprise.*

"As to the 'substantial risk of harm' objective requirement of a failure to protect claim, the Eighth Circuit has previously held that a plaintiff has successfully established a substantial risk of harm to a victim in the following situations: (1) where 'the attacker was known to be a volatile, dangerous man,' (2) where the attacker 'previously threatened or fought with the victim,' or (3) where the attack involved 'a victim who should have been better protected because of known prior inmate threats.'" *Johnson v. Jefferson County, Missouri*, 4:22-CV-375-JSD, 2024 WL 2160543, at \*3 (E.D. Mo. May 3, 2024) (quoting *Vandevender v. Sass*, 970 F.3d 972, 976 (8th Cir. 2020) (citing *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007); *Newman v. Holmes*, 122 F.3d 650, 651 (8th Cir. 1997); *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998); *Prater v. Dahm*, 89 F.3d 538, 540 (8th Cir. 1996); *Jones v. Wallace*, 641 F. App'x 665, 666 (8th Cir. 2016); *Pagels v. Morrison*, 335 F.3d 736, 739 (8th Cir. 2003)). "In the alternative, a plaintiff can demonstrate a substantial risk due to a general risk of harm by 'showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.'" *Id.* (quoting *Patterson*, 902 F.3d at 852 (quoting *Farmer*, 511 U.S. at 842)).

"Notably, the Eighth Circuit has repeatedly 'upheld the grant of qualified immunity from § 1983 damage claims to prison officials who allegedly failed to protect an inmate from another inmate's surprise attack.'" *Id.* (quoting *Vandevender*, 970 F.3d at 976); *see also Curry v. Crist*, 226 F.3d 974, 978-79 (8th Cir. 2000) ("We have held in a number of cases that prison officials are entitled to qualified immunity from § 1983 damage actions premised on an Eighth Amendment failure-to-protect theory when an inmate was injured in a surprise attack by another inmate") (citing *Jackson*, 140 F.3d at 1152; *Prosser v. Ross*, 70 F.3d 105, 1007 (8th Cir. 1995); *Smith v.*

*Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990)). *See also Jackson*, 140 F.3d at 1152 (cleaned up) ("[B]ecause prisons are dangerous places, housing the most aggressive among us and placing violent people in close quarters, … prison officials are entitled to qualified immunity from claims arising out of a surprise attack by one inmate on another.").

The holding in *Johnson*, 2024 WL 2160543, and its affirmation by the Eighth Circuit, 2025 WL 2112860, is instructive on this point. In *Johnson*, after the plaintiff was attacked by another inmate, he requested to be moved to protective custody. 2025 WL 2112860, at *1. The plaintiff was subsequently moved and his attacker was marked as an enemy on the plaintiff's Integrated Jail Management System (IJMS) profile. *Id.* Later that same day, the plaintiff asked the defendant-correctional officers to leave his cell for recreation time. *Id.* One of the defendant-correctional officers then instructed two other inmates who were in the general area to return to their cells as plaintiff's cell was opened. *Id.* The other two inmates refused to return to their cell and instead attacked plaintiff, causing him to sustain a fractured spine and forehead laceration. *Id.*

While the Eighth Circuit affirmed qualified immunity after analyzing the second prong of a failure-to-protect claim (*Id.* at *4), the district court analyzed the first prong, an objective test, and granted the defendants qualified immunity. *Id.* at *2. The district court found that prior to the surprise attack, there was not a substantial risk of harm to plaintiff by his second attackers; that the attackers were not known to be volatile, dangerous, violent, or in protective custody for being violent; that the plaintiff had no relationship with either attacker; and lastly that there was no general risk of harm due to a longstanding, pervasive, and well-documented history of inmate attacks. *Id.* at 2. Therefore, Plaintiff provided no evidence that he was incarcerated under conditions posing a substantial risk of harm. *Id.*

Similar to *Johnson*, here, Plaintiff's attack was a surprise. First, there is no evidence that

Plaintiff had ever reported to Jordan, or any correctional officer at the CJC, that any detainees had made threats towards him, much less Williams or Newberry. (UMF #13 & 27). Further, as in *Johnson* where the attackers were not known to be volatile, dangerous, or violent, here, Plaintiff can present no evidence that the detainees who attacked Plaintiff were known to be volatile, dangerous, or violent. Even if Plaintiff had a previous relationship with his attackers, Plaintiff will not be able to present any evidence that Jordan was responsible for Plaintiff's attackers accessing Plaintiff's cell; Plaintiff's attackers were only able to access Plaintiff's cell after Williams violently attacked Jordan and Newberry forcefully took Jordan's keys, all while Jordan was locked in a shower cell. (UMF #8, 9, 17, 18, & 21). Lastly, as in *Johnson* where there was no evidence of a longstanding, pervasive, and well-documented history of inmate attacks, here, Plaintiff can present no evidence that there is a longstanding, pervasive, and well-documented history of inmate attacks.

Because Plaintiff cannot provide evidence that his attack was anything more than a surprise, of which Jordan did not and could not have known, there is no evidence that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. Therefore, Jordan is entitled to qualified immunity.

ii. *Officer Jordan is entitled to qualified immunity where Plaintiff cannot, and will not be able to, show that Jordan was deliberately indifferent to Plaintiff's risk of harm where Jordan was under duress and was physically incapable of protecting Plaintiff.*

Jordan is also entitled to qualified immunity because Plaintiff cannot show that Jordan was deliberately indifferent to Plaintiff's risk of serious harm. "To show an unconstitutional failure to prevent harm, [Plaintiff], 'must establish [that] the prison officials were deliberately indifferent to inmate health or safety.'" *Johnson*, 2025 WL 2112860, at *3 (quoting *Holden*, 663 F.3d at 341). "This is a subjective requirement, mandating the prisoner prove the official both knew of and

disregarded 'an excessive risk to inmate health and safety.'" *Holden*, 663 F.3d at 341 (quoting *Farmer*, 511 U.S. at 837); *see also Hodges*, 61 F.4th at 592 ("An official is deliberately indifferent only if he actually knows of the substantial risk and fails to respond reasonably to it."). "Deliberate indifference is 'something more than negligence but less than actual intent to harm.'" *Johnson*, 2025 WL 2112860, at *3 (quoting *Jackson*, 140 F.3d at 1152). "[T]he defendant must be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hodges*, 61 F.4th at 592 (quoting *Farmer*, 511 U.S. at 837). "Whether a risk was known to a defendant must be considered from that defendant's perspective at the time in question, 'not with hindsight's perfect vision.'" *Headrick v. Waate*, 4:18-CV-1669-SEP, 2020 WL 7041812, at *5 (E.D. Mo. Nov. 30, 2020) (quoting *Jackson*, 140 F.3d at 1152). "Some of the factors relevant to assessing a defendant's subjective awareness of a substantial risk of serious harm include whether the defendant knew about threats against the plaintiff, whether the plaintiff reported to the defendants that he felt in danger or wanted protection, whether the plaintiff's assailant [] had a known propensity for violent behavior, and whether the defendants were aware of a history of adverse interactions between the plaintiff and his assailant." *Id.* (citing *Pagels*, 335 F.3d at 740-41; *Schoelch v. Mitchell*, 625 F.3d 1041, 1047-48 (8th Cir. 2010)).

Public officials are entitled to qualified immunity on a failure to protect claim when they <u>cannot</u> intervene in the attack. *Williams v. Willits*, 853 F.2d 586, 591 (8th Cir. 1988). In *Williams*, the plaintiff was involved in a yard fight with another prisoner, resulting in injuries to the plaintiff. *Id.* at 587. Although there were three to five prison staff on site at the fight, no physical intervention occurred for the safety of the inmates and the staff. *Id.* The Court found the record demonstrated that if the staff attempted to break up the fight, they would risk the health and safety of all concerned. *Id.* at 591. Further, the guards were outnumbered by the inmates, making it "physically

11

impossible" to break up the fight. *Id.* Therefore, there was no constitutional violation because the plaintiff could not show that the guards were deliberately indifferent. *Id.*

Similar to *Williams*, here, it was physically impossible for Jordan to protect Plaintiff from his attackers. In *Williams*, the defendants were physically restricted from protecting the plaintiff from harm. Likewise, here, Jordan was surprise-attacked, locked in a cell, pepper-sprayed, and handcuffed, making it physically impossible for him to protect Plaintiff from his attackers. (UMF #8, 9, 16, 18, & 20). Therefore, where Jordan was physically unable to prevent Plaintiff's attack, he was not deliberately indifferent to Plaintiff's safety.

Further, a defendant is not deliberately indifferent when they had no knowledge that an inmate posed a risk of attacking a plaintiff. *Johnson v. Schurman*, 2025 WL 2112860, at \*4. In analyzing the deliberate indifference prong of the failure-to-protect rule, the Eighth Circuit in *Johnson* held that the plaintiff presented no evidence of deliberate indifference. *Id.* at \*3. First, there was no evidence that the defendants knew the attackers were a threat to the plaintiff. *Id.* Further, there was no evidence that the plaintiff was a likely target of an impending attack. *Id.* at \*4. Additionally, the plaintiff and the attackers had no previous hostile relationship and the attackers were not known by anyone to be violent. *Id.* Therefore, at most, the officers were negligent by permitting the plaintiff to exit his cell, but this fell well below the standard of deliberate indifference. *Id.* "In the absence of an obvious risk, we have required that the inmate provide evidence that the prison official knew of 'a specific threat posed by [the attacker].'" *Id.* (quoting *Patterson*, 902 F.3d at 851); *see also Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002) ("We have held in several cases that qualified immunity for prison officials is appropriate when an Eighth Amendment failure-to-protect claim arises from inmate injuries resulting from a surprise attack by another inmate") (finding no deliberate indifference because there was no evidence that

the plaintiff "was the likely target of an impending attack by [the attacker]," there was no evidence that the officer "had any actual knowledge" of altercations between the plaintiff and the attacker "much less that he knew [the attacker] would attack [the plaintiff]"); *see also Pratt v. Deville*, 15-0129, 2016 WL 1602948, at *6 (W.D. La. Feb. 23, 2016) (Defendants entitled to summary judgment where plaintiff was injured during an inmate-initiated riot because "[t]he defendants simply cannot be said to have been deliberately indifferent in failing to protect against a potential harm of which they were unaware … [t]o require such 'absolute safety' would ask the impossible of prison administrators.").

Here, as in *Johnson*, Plaintiff has provided no evidence, nor will be able to provide any evidence, that Jordan had knowledge that Plaintiff's attackers were likely to attack Plaintiff. (UMF #27). Plaintiff never told Jordan that any of his attackers had made threatening comments towards him and Jordan had no reason to believe that Plaintiff was at risk of serious harm. (UMF #27). Not only did Jordan not know that Plaintiff's attackers posed a threat to Plaintiff, Jordan had no knowledge that Williams and Newberry posed a threat to himself. (UMF #11). Further, Jordan was left defenseless, unable to protect Plaintiff, after he was locked in a cell, had his radio taken, his hands handcuffed, and was pepper sprayed. (UMF #15, 18 & 20). Additionally, Plaintiff's attackers came from wing 4A, an area of the CJC separated from 4B, only accessible using the keys Newberry forcefully took from Jordan. (UMF #17 & 22). When Jordan was violently assaulted and locked in the shower cell, he was left helpless, unable to stop Newberry from unlocking the area to 4A and allowing other detainees to enter 4B. (UMF #18). Even if Jordan knew that Plaintiff's attackers posed a substantial risk of harm towards Plaintiff, they were locked in a different wing of the CJC, and Jordan was unable to prevent their entry into 4B. (UMF #18 & 22). Further, Jordan had no knowledge that Plaintiff was even attacked. (UMF #26). Jordan was

presented with no information that by delivering breakfast trays, Plaintiff's safety was at risk. Jordan was the victim of a brutal assault, targeted because of his age. (UMF #8, 9 & 2). His inability to protect Plaintiff from harm was not due to deliberate indifferent or even negligence, it was due to Williams and Newberry attacking him by surprise. Therefore, Jordan did not act deliberately indifferent to a known, excessive risk of serious harm to Plaintiff's safety; instead, he was under duress and could not protect Plaintiff. Thus, as in *Johnson* where the court held the defendant-correctional officers were entitled to qualified immunity because there was no evidence they acted with deliberate indifference, here, the Court should award Jordan qualified immunity because Plaintiff has presented no evidence that Jordan acted with deliberate indifference.

Therefore, Plaintiff has provided no evidence that Officer Jordan was deliberately indifferent to the substantial risk of serious harm, thus Officer Jordan is entitled to qualified immunity.

B. <u>Clemons-Abdullah is entitled to qualified immunity from Plaintiff's Conditions of Confinement claim because Clemons-Abdullah did not violate a clearly established right.</u>

"The Eighth Amendment imposes a duty on officials to provide humane conditions of confinement, including ensuring that prisoners receive adequate food." *Reed v. Showmaker*, 4:23-CV-763-JMB, 2023 WL 4761632, at \*4 (E.D. Mo. July 26, 2023) (citing *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)). "However, the Constitution 'does not mandate comfortable prisons.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987).

"A plaintiff may demonstrate violation of his constitutional rights by evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate

danger to his health, or that his health suffered as a result of the food." *Ingrassia v. Schafer*, 825 F.3d 891, 897 (8th Cir. 2016). "While a denial of food can constitute a constitutional violation, the deprivation of **a few meals for a limited time** generally does not rise to the level of an Eighth Amendment violation." *Reed*, 2023 WL 4761632, at *4 (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)) (emphasis added). "The negligent failure to procure, or even the deliberate refusal to provide, a single meal does not establish a deprivation sufficiently serious to constitute a constitutional violation…" *Anderson v. Purkett*, 4:06-CV-1451-DJS, 2009 WL 539937, at *4 (E.D. Mo. Mar. 4, 2009). "[A] prisoner may properly allege a constitutional violation by demonstrating significant weight loss or other adverse physical effects from lack of nutrition." *Ingrassia*, 825 F.3d at 897 (citing *Davis v. Missouri*, 389 Fed. Appx. 579, 579 (8th Cir. 2010) (citing cases for proposition that "inmate claiming inadequate diet under Eighth Amendment must allege he lost weight or suffered adverse physical effects, or was denied nutritionally or calorically adequate diet")). To demonstrate a constitutional violation, the plaintiff must show that the defendant was deliberately indifferent to their nutritional needs. *See Farmer*, 511 U.S. at 842.

In *Reed v. Showmaker*, the Court dismissed the plaintiff's conditions-of-confinement claim, based on inadequate nutrition, for failing to state a constitutional violation. 2023 WL 4761632, at *4. There, the plaintiff alleged the defendants had "denied him meals on 'multiple occasions' and 'on different days' over an approximate ten-month period," and specifically one defendant denied him breakfast one morning. *Id.* The Court held this alone did not create a constitutional violation, because "the deprivation of a few meals for a limited time generally does not rise to the level of an Eighth Amendment violation." *Id.* Plaintiff's allegation against the defendant who denied him breakfast one day specifically was subject to dismissal because "the denial of one meal is not enough to plead a constitutional violation." *Id.*; *see also Richardson v.*

*Jones*, 1:10-CV-01015, 2011 WL 31533, at \*6 (W.D. Ark. Jan. 5, 2011) ("Nor does the mere fact that [plaintiff] may have on certain occasions received less than three meals a day state a claim of constitutional dimension.").

Similarly, in *Roberts v. SECC Department of Corrections*, the plaintiff's conditions-of-confinement claim, based on inadequate nutrition, was dismissed by the Court for failing to state a constitutional violation. 1:22-CV-00004-SRC, 2022 WL 4016739, at \*6 (E.D. Mo. Sep. 2, 2022). There, the plaintiff brought several claims under § 1983, including a conditions-of-confinement claim, alleging defendants spit in his food and denied him meals. *Id.* at \*3. In its review, the court held "the deprivation of a few meals for a limited time generally does not rise to the level of an Eighth Amendment violation." *Id.* at \*7. Plaintiff's claim that defendants took his meals on two separation occasions was not sufficient for a constitutional violation. *Id.*; *see also Love v. Price*, 4:18-CV-1595-SPM, 2019 WL 918284, at \*8 (E.D. Mo. Feb. 25, 2019) ("[Plaintiff] does not … provide any facts showing this was inadequate to his nutritional needs. For example, he does not claim that he went hungry, that he lost weight, or that his health suffered under this meal plan"); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (providing plaintiff one meal per day, for fifteen days, was not a constitutional violation because the meals provided sufficient nutrition); *Davis v. Miron*, 502 Fed. Appx. 569, 570 (6th Cir. 2012) (denying plaintiff seven meals over six days was not a constitutional violation); *Turner v. Warden, GDCP*, 650 Fed. Appx. 695, 702 (11th Cir. 2016) ("And although [plaintiff] says he was not given any food for a 24-hour period, he was not regularly deprived of adequate nutrition and points to no evidence that his health was jeopardized due to this single deprivation. Consequently, these conditions do not rise to the level of cruel and unusual deprivations. Summary judgment on these claims was proper.").

As in *Reed* and *Roberts*, here, Plaintiff has not suffered a constitutional violation from

conditions-of-confinement. As in *Reed*, where the court dismissed the plaintiff's claim against a defendant who denied him one meal on one occasion, here, at most, Plaintiff missed three meals on the day of the riot, which is not sufficient for a constitutional violation. (UMF #52). Once Plaintiff was placed into a temporary housing cell, he received sack lunches consisting of sandwiches, chips, and cake. (UMF #50 & 52). Plaintiff has presented no evidence that his nutrition was inadequate, providing nothing to show he lost weight or his health suffered. Additionally, as in *Reed* and *Roberts* where the Court held the plaintiffs did not allege facts of deliberate indifference, here, Plaintiff has presented no evidence that Clemons-Abdullah was deliberately indifferent towards Plaintiff's health and safety. (UMF #56 & 57). It is not the Commissioner's job to personally provide food to the detainees and Clemons-Abdullah never gave an order instructing her employees to withhold food from the Plaintiff. (UMF #56 & 57). Clemons-Abdullah had no knowledge that Plaintiff was not provided regularly scheduled meals nor that Plaintiff made any complaint about the frequency of meals he received. (UMF #56 & 57). Therefore, because Plaintiff has presented no evidence that his health suffered nor that Clemons-Abdullah acted with deliberate indifference towards his health, Clemons-Abdullah is entitled to qualified immunity.

## II. PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES.

The Prison Litigation Reform Act ("PLRA") provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The rationale for the PLRA exhaustion requirement is two-fold: 1) exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court; and 2) exhaustion

promotes efficiency. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). The Supreme Court has held that the PLRA exhaustion requirement requires proper exhaustion, which "means using all steps that the agency holds out, and doing so properly." *Id.* at 90. If the grievance procedure is still available to a plaintiff, it makes no difference that they have been transferred to another facility. *See Avila v. Bellefy*, No. 24-3225, 2025 WL 2219011, at *1 (8th Cir. Aug. 5, 2025).

Section 3.3.3 of the Division of Corrections Institutional Operations (entitled "Inmate Grievance") delineates the proper exhaustion procedures Plaintiff was to follow while at the CJC. (UMF #62). Under Section 3.3.3, an inmate may request to file an information resolution request ("IRR"). *See* Def.'s Ex. H, Section 3.3.3, p. 7. Once the Constituency Services Unit ("CSU") officer receives the request, an IRR Form is issued to the inmate. *See* Def.'s Ex. H, Section 3.3.3, p. 8. Upon receipt of the IRR Form, the inmate is required to sign an IRR Acknowledgement Form. *See id.* Once the IRR Form is received, the CSU officer is allowed seven working days to investigate the complaint and provide the inmate a written response to the complaint. *See id.* If the inmate deems the CSU officer's response to the IRR to be unacceptable, the inmate has the option of filing a Formal Grievance with the Grievance Coordinator. *See* Def.'s Ex. H, Section 3.3.3, p. 9. The Grievance Coordinator has ten working days from receipt of the Grievance Form to issue a response that resolves the grievance. *See* Def.'s Ex. H, Section 3.3.3, p. 10. If the Grievance Coordinator's response is unacceptable to the inmate, the inmate has the option of filing an appeal with the Commissioner of Corrections. *See id.*

In place of the IRR process, inmates may file an emergency grievance when conditions exist in which going through the normal grievance process would subject the inmate to substantial risk of personal injury or other damages. *See* Def.'s Ex. H, Section 3.3.3, p. 11. In order to submit an emergency grievance, the inmate is to submit a written complaint marked "EMERGENCY

GRIEVANCE." *See id.* If determined to be an actual emergency grievance, the Grievance Coordinator confers with the Detention Center Superintendent who immediately notifies the Commissioner and directs the grievance to appropriate staff in the chain of command that they may be able to initiate immediate and appropriate corrective steps to resolve the problem. *See id.* Once the grievance has been resolved, the Grievance Coordinator will prepare a written response to the inmate regarding the resolution. *See id.*

If an inmate finds the resolution of the emergency grievance or formal grievance unacceptable, the inmate is given an opportunity to appeal. *See* Def.'s Ex. H, Section 3.3.3, p. 12. The Commissioner will issue a response to the appeal within ten working days. *See id.* Once the appeal response has been issued by the Commissioner and discussed with the inmate, the grievance process is exhausted. *See* Def.'s Ex. H, Section 3.3.3, p. 13.

Here, Plaintiff failed to properly exhaust his administrative remedies. Plaintiff has admitted, and it is undisputed, he made no attempt to use the grievance process in place at the CJC. (UMF #61). Plaintiff failed to file an IRR, grievance or emergency grievance related to his claims in this Complaint. Instead of filing a grievance while at the CJC, Plaintiff filed this lawsuit. (UMF #58). Plaintiff spent an additional 15 months at the CJC before being transferred, with ample time and opportunity to file a grievance. (UMF #59). In fact, Plaintiff filed this lawsuit before he was transferred from the CJC. (UMF #58 & 59). Therefore, even though the grievance process was available to him, Plaintiff failed to initiate and complete the grievance process. Because Plaintiff failed to properly complete the grievance process, he did not exhaust his administrative remedies, and Defendants' motion for summary judgment should be granted.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this honorable Court grant summary judgment in their favor and against Plaintiff.

**Respectfully Submitted,**

**MICHAEL GARVIN**
**CITY COUNSELOR**

By: */s/ Jay Hollman*
Jay Hollman, #76649 (MO)
Assistant City Counselor
1200 Market Street
City Hall Room 314
St. Louis, Missouri 63103
Phone: 314.622.4298
Fax: 314.622.4956
hollmanj@stlouis-mo.gov

*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, the foregoing was mailed via first class mail, postage prepaid, to the following:

Cleveland Washington
#1400907
Eastern Receptions, Diagnostic and Correctional Center
2727 Highway K
Bonne Terre, MO 63628
*Plaintiff pro se*

*/s/ Jay Hollman*